# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | | |
|---|---|---|
| Anchorage School District, | ) | |
| | ) | |
| Plaintiff, | ) | 3:27-CV-00160 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| Starr Indemnity & Liability Co., | ) | [Re: Motions at docket 14, 21] |
| | ) | |
| Defendant. | ) | |

## I. MOTIONS PRESENTED

At docket 14, Plaintiff Anchorage School District ("Plaintiff" or "ASD") filed a motion for summary judgment as to its complaint against Defendant Starr Indemnity & Liability Co. ("Defendant" or "Starr"), asking that the court declare that all amounts paid to an ASD student pursuant to ASD's "Catastrophic Student Blanket Accident Policy" issued by Ace American Insurance Company ("Ace") will work to erode the retained limit needed to trigger coverage under ASD's "Special Excess Liability Policy" issued by Starr. Defendant filed a response and cross motion for summary judgment at docket 21.[1] Plaintiff filed a response to the cross motion for summary judgment and a

---

[1] A duplicate copy was filed at docket 16.

reply to its motion at docket 23.[2] Defendant replied at docket 26. Oral argument was not requested and would not be of assistance to the court.

## II. BACKGROUND

ASD is the school district governing most of the schools in the Anchorage area. It purchased an excess liability policy from Starr with a limit of $10 million (the "Starr Policy"). However, given that it is an excess liability policy, it has a retained limit of $1.5 million, meaning coverage under the Starr Policy is only triggered after the retained limit has been met. The retained limit can be met through the insured, ASD, paying out of pocket or obtaining underlying insurance coverage.

ASD also purchased a policy from Ace Insurance Company (the "Ace Policy"). The Ace Policy is labeled a "Catastrophic Blanket Accident Policy" that provides various coverage to injured students totaling up to $1.65 million. The Ace Policy is not a liability policy; rather, it provides first-party benefits to injured ASD students regardless of fault on the part of ASD.

On December 15, 2014, an ASD student was severely injured during wrestling practice. The student and his parents asserted a negligence claim against ASD. ASD tendered the claim to its insurance providers. The student received benefits under the Ace Policy. ASD contends that the benefits paid to the student under its Ace Policy erode the $1.5 million retained limit in the Starr Policy, triggering excess liability coverage up to $10 million. Starr, however, asserts that the payments made to the student under the Ace Policy do not count toward the retained limit because (1) the Ace

---

[2]A duplicate copy was filed at docket 22.

Policy is not an "underlying insurance" policy for ASD and (2) payments made pursuant to the Ace Policy do not constitute "payments for judgments, settlements, or defense costs" as is required to erode the retained limit under the Starr Policy. ASD responds that a reasonable interpretation of the Starr Policy does not require underlying insurance to be liability insurance or to cover payments for judgments, settlements, or defense costs. It instead argues that the Starr Policy only requires any underlying insurance to be "available" to ASD and the term "available" is ambiguous enough to include an ASD policy that is at ASD's disposal for the purpose of resolving a claim against it.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[4] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[6]

---

[3]Fed. R. Civ. P. 56(a).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Id.*

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[7] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[8] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[9] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[10] However, the non-moving party may not rest upon mere allegations or denials but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[11]

## IV. DISCUSSION

The dispute at issue in this litigation turns on the interpretation of the Starr Policy. Under Alaska law, the interpretation of an insurance contract is a question of law for the court.[12] The court must construe an insurance policy in such a way as to give effect to an insured's reasonable expectations in light of ordinary usage of terms in

---

[7]*Id.* at 323.

[8]*Id.* at 323-25.

[9]*Anderson,* 477 U.S. at 248-49.

[10]*Id.* at 255.

[11]*Id.* at 248-49.

[12]*United Servs. Auto. Ass'n v. Neary*, 307 P.3d 907, 910 (Alaska 2013).

the contract.[13]  "However, since most insureds develop an expectation that every loss will be covered, the reasonable expectation doctrine 'must be limited by something more than fervent hope engendered by loss.'"[14]  In interpreting the contract to determine reasonable expectations, the court looks to (1) the language of the disputed policy provisions; (2) language of other policy provisions; (3) relevant extrinsic evidence; and (4) case law interpreting similar provisions.[15]  "Ambiguities in an insurance policy are to be construed most favorably to an insured, but ambiguities only exist when there are two or more reasonable interpretations of particular policy language."[16]  Grants of coverage should be construed broadly and exclusions interpreted narrowly.[17]

The disputed policy provisions in this case involve those related to the retained limit and what is necessary to erode that limit and trigger excess coverage.  As noted above, the Starr Policy provides coverage up to $10 million above the retained limit of $1.5 million: "We will pay on your behalf those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of bodily injury . . . ."[18]  The coverage is limited in Section III of the Starr Policy:

---

[13]*State Farm Fire & Cas. Co. v. Bongen*, 925 P.2d 1042, 1047 (Alaska 1996).

[14]*Id.* (quoting *Millar v. State Farm Fire & Cas. Co.*, 804 P.2d 822, 826-27 (Ariz. 1990)).

[15]*Id.; see also Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004).

[16]*State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008).

[17]*Teel*, 100 P.3d at 4.

[18]Doc. 14-2 at p. 25 (Plaintiff's Ex. 1, Starr Policy Section I.A.1.).

-5-

C. We will pay any sums covered under this Policy only after your **retained limit** has been exhausted by payments for judgments, settlements or defense costs for **claims** and **suits** subject to Paragraph B above. We will then pay damages in excess of your **retained limit** up to our Limits of Insurance.

D. If you procure **underlying insurance** with limits of liability that are less than your **retained limit**, you shall bear the risk of the difference. If such limits are greater than your **retained limit**, this Policy is excess of the greater limits.[19]

The bolded terms in the Starr Policy are those that are specifically defined. The disputed and relevant terms here are "retained limit" and "underlying insurance." Those terms are defined as follows:

X. **Retained limit** refers to the amount stated in the Declarations. The amount may consist of a self-insured retention, **underlying insurance** or a combination thereof. The **retained limit** will be the sum of all damages for: 1. Bodily injury, property damages or personal and advertising injury arising out of each such occurrence . . . [or] wrongful act; . . . . In determining the retained limit that applies only one of the following will apply to the damages or losses of a claim or suit brought: . . .All occurrences [or wrongful acts] arising out of continuous, repeated, or related occurrences shall be treated as a single occurrence and the retained limit in effect at the first occurrence shall apply. . . . The **retained limit**, with respect to a self-insured retention, shall include defense costs. The **retained limit** shall not include salaries of your **employees**, your office expenses, or expenses of any claims servicing organization that you have engaged. However, the **retained limit** shall include allocated defense costs incurred in the investigation, defense or appeal of a **claim** or **suit** to which this insurance applies by attorneys, paralegals, adjusters and investigators who are your **employees**.

AA. **Underlying insurance** refers to any policies listed the Schedule of Underlying Insurance and includes: 1. Any renewal or replacement of such policies; 2. Any other insurance available to you; and 3. Any

---

[19]Doc. 14-2 at p. 29 (Plaintiff's Ex. 1, Starr Policy Section III.C & III.D).

        other valid and collectible risk financing mechanism provided under
        a **purchase group**.[20]

Although not a term used in any of the disputed provisions, a definition for "underlying insurer" is also set forth in the Starr Policy:

  BB.  **Underlying insurer** means any insurer which provides any policy listed in the Schedule of Underlying Insurance, which may be included in this Policy, and includes any insurer which provides any renewal or replacement of such policies and any insurer which provides any other primary insurance available to you.[21]

ASD asserts that under the Starr Policy, specifically Section III.C and Section III.D, the retained limit can be exhausted in one of two ways: either (1) through self-insurance where payments are made for "judgements, settlements and defense costs" or (2) through underlying insurance of any kind that is "available" to ASD. It then argues that the issue for the court is simply whether the Ace Policy constitutes "any other insurance available to [ASD]." As noted above, Section III.C, explains that the excess liability coverage under the policy is only triggered after the retained limit has been met by payments for settlements, judgments or defense costs related to claims and suits. The definition of "retained limit" states that it can consist of both self-insurance or underlying insurance. Therefore, the limitation in Section III.C is not necessarily confined to those payments made by an insured without underlying insurance as ASD suggests and nothing in Section III.D negates or modifies the limitation set forth in Section III.C. However, when considering these provisions in light of the definitions provided in the Starr Policy, the court agrees that the Starr Policy is

---

[20]Doc. 14-2 at pp. 36, 37 (Plaintiff's Ex.1, Starr Policy Section IV.X & IV.AA).

[21]Doc. 14-2 at p. 37 (Plaintiff's Ex. 1, Starr Policy Section IV.BB).

nonetheless ambiguous as to how exactly the retained limit works and whether payments under the Ace Policy to the student who was injured and brought negligence claims against ASD can be considered payments for settlements, judgments or defense costs related to claims and suits.

To start, the definition of retained limit can consist of "underlying insurance." Underlying insurance includes "[a]ny other insurance available to [ASD]." Starr argues that the Ace Policy, under which ASD is not the insured, is clearly not "available" to ASD. Indeed, the Ace Policy is not a liability insurance policy with ASD listed as the insured. ASD is simply the policy holder, paying the premiums to provide accident insurance to its students, and eligible students are the insureds. The policy covers, among other things, expenses an injured student incurs for treatment, services, and supplies related to the injury. These expense are paid to the insured student regardless of any determination of fault on the part of ASD and without any release in favor of ASD.

ASD argues that despite the fact that it is not the insured party, the policy is, albeit indirectly, "available" to it because any payments made to an injured student who is bringing a claim against ASD would qualify as advance payments towards that student's damages. These payments—arranged by ASD as the policyholder to benefit injured students—would ultimately reduce any amount for which ASD has to pay him or her to resolve the claim because, under Alaska law, a claimant's recovery is reduced by payouts from a non-collateral source, such as the tortfeasor's insurance company.[22]

---

[22]*Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 790 (Alaska 1999) (explaining that "[a] collateral source is a source [that] is entirely independent of and collateral to a wrongdoer who

-8-

Starr counters that such an indirect benefit is clearly not enough to make the policy "available" to it. That is, there is no situation where ASD itself could ever make a claim or receive benefits under the Ace Policy, and therefore, under the plain meaning of the term "available," it cannot reasonably be considered an underlying insurance policy. What is meant by an available insurance policy is not unambiguously constrained as Starr suggests. That is, Starr's interpretation is not the only possible one. As noted by ASD, courts that have previously considered what is meant by insurance provisions referring to "other available insurance" have concluded that the term is ambiguous because it has many ordinary meanings ranging from actually available (in one's hand) to hypothetically available (a possible source of coverage even if the limits of that coverage have already been exhausted).[23] The courts, because of the ambiguity, interpret "other available insurance" provisions in a manner that meets the insured's expectation of coverage, as long as the insured has taken reasonable steps to obtain the other available coverage.[24] As ASD argues, *in this particular situation* where the student was injured and brought a claim against ASD and ASD tendered the claim to both its insurer providing the blanket accident policy and the

---

is legally responsible for the injuries" and noting that a victim's own insurance or charity may be a collateral source but a torfeasor's insurance is not because it is paid for by the tortfeasor. (internal quotations omitted)).

[23]*See, e.g., Benzer v. Iowa Mut. Tornado Ins. Ass'n*, 216 N.W.2d 385 (Iowa 1974); *Kraft v. Allstate Ins. Co.*, 431 P.2d 917 (Ariz. Ct. App. 1967); *Auto-Owners Ins. Co. v. Leefers*, 512 N.W.2d 324 (Mich. Ct. App. 1994).

[24]*See Narron v. Cincinnati Ins. Co.*, 97 P.3d 1042, 1050 (Kan. 2004) (discussing cases that interpret what "available" means in the context of "other available insurance" clauses and adopting a rule that allows excess insurance coverage to be tapped in the event there is no other coverage actually available after reasonable efforts are taken to obtain the other primary coverage).

insurer providing the excess liability policy, and the former began making payments to the student, ASD could reasonably expect coverage under the Starr Policy once the payments from the Ace Policy meet the set amount of the retained limit. That is, given that grants of coverage should be construed broadly and exclusions interpreted narrowly, the ambiguous phrase "other insurance available to you" could reasonably include any insurance obtained by ASD that is at ASD's disposal to satisfy the student's claim for damages.

Starr argues that regardless of whether the Ace Policy could conceivably and indirectly be "available" to ASD, the Starr Policy as a whole makes clear that the Ace Policy payments cannot erode the retained limits to trigger coverage under the Starr Policy. It argues that underlying insurance—or insurance available to ASD— necessarily and unambiguously means primary liability insurance in the context of an excess insurance policy. However, ambiguity is determined "from the standpoint of a layman, not from that of a lawyer."[25] The Starr Policy's definition of underlying insurance does not qualify the type of insurance that is required to meet the retained limit. Starr relies on the definition of "underlying insurer," which, as shown above, takes the definition of underlying insurance but inserts the word "primary" into it. Starr argues that the inclusion of the word "primary" in the related definition clearly requires that the underlying insurance policy be a primary liability one. However, the term "underlying insurer" is not actually used in the definition or provisions related to retained limit nor in the definition of underlying insurance. That is, there is nothing pointing the insured to

---

[25]*Ayres v. Prudential Ins. Co. of Am.*, 602 F.2d 1309, 1311 (9th Cir. 1979).

-10-

that definition, and therefore the insured would not be put on notice that Starr meant to qualify even further what was meant by underlying insurance when it inserted a slightly different definition of underlying insurer (as opposed to underlying insurance).  While that may have been Starr's intention, the Policy as drafted does not clearly convey as much.

Starr argues that the limitation in Section III.C, further requiring that the retained limit be exhausted by payments for judgements, settlements, or defense costs, makes clear that other insurance used to meet the retained limit must in fact be liability insurance.  However, this limitation is not as clear as Starr asserts.  A reasonably prudent layperson would not necessarily conclude that exhaustion by judgments, settlements, or defense costs means that the retained limit can only be exhausted by payments made pursuant to a liability policy.  The definition of retained limit only further obscures the issue.  As noted above, the definition states that the retained limit is the amount set forth in the policy's declarations and consists of the sum of all damages that begins to accrue at the first occurrence or wrongful act.  It does not mention damages owing as a result of judgments or settlements, but it does specify that the retained limit "with respect to self-insured retention" shall include defense costs.  It then explains what types of costs are eligible to be considered defense costs.  This definition of retained limit reasonably creates confusion on the part of an insured as to how the retained limit works under the Starr Policy.  More importantly, contrary to Starr's position, payments for judgements and settlements could reasonably be understood to include damages paid in advance pursuant to the Ace Policy.  That is, the court agrees with ASD's assertion that

-11-

[a] reasonably prudent layperson would easily consider that the payments made towards [the student] qualify as such payments for [the student's] claim, which are not hypothetical. . . . [The Ace Policy] covers expenses actually incurred for treatment, services and supplies related to an insured's injury. These are precisely the expense for which [the student] would otherwise be reimbursed upon the resolution of his matter. . . . [The payments] would ultimately qualify as prior-paid settlement expenses – and the Starr Policy does not specifically preclude erosion of the retained limit through future such expenses it would otherwise have to bear.[26]

Starr points to a subrogation provision in the Ace Policy in support of its position that the Ace Policy cannot qualify as underlying insurance because it is not liability insurance. That provision states as follows: "[Ace] may recover any benefits paid under the [Ace Policy] to the extent an Insured is paid for the same Injury by a third party, or another insurer."[27] Starr argues that this subrogation provision demonstrates that the Ace Policy is not intended to be a primary policy in relation to the Starr policy; Ace could seek reimbursement from Starr which would change the nature of the Starr Policy from merely an excess liability insurance policy to a primary one, which clearly was not intended. ASD counters that Ace is not entitled to subrogation from its own insured for a claim arising from the very risk for which the insured was covered.[28] Starr asserts that Ace could seek reimbursement from Starr because it is "another insurer." The court need not decide whether Ace could in fact seek reimbursement from Starr because nothing in the Starr Policy unambiguously prevents the Ace Policy from qualifying as underlying insurance in this situation. In other words, while Starr may have intended to

---

[26] Doc. 22 at pp. 10-11.

[27] Doc. 14-4 at p. 21 (Ex. 3, Ace Policy, at p. 21).

[28] *Alaska Ins. Co. v. RCA Alaska Commc'ns Inc.*, 623 P.2d 1216, 1217-18 (Alaska 1981).

-12-

require any underlying insurance to be primary liability insurance, its policy is far from clear on that point. There is nothing in the definition of retained limit or underlying insurance stating as much and the requirement that the retained limit be exhausted by judgments, settlements, and defense costs does not unambiguously convey this intention.

## V. CONCLUSION

Based on the preceding discussion, Plaintiff's motion for summary judgment at docket 14 is GRANTED, and Defendant's motion for summary judgment at docket 21 is DENIED.

DATED this 6th day of February 2018.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT